**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
———————————————————————————

**DONNA RICH and MARK RICH,** *individually*
*and as wife and husband*,

                                        **Plaintiffs,**

            **vs.**                                                    **1:10-cv-1371**
                                                                       **(MAD/CFH)**

**TEE BAR CORP. and ROCKING HORSE**
**RANCH CORP.,**

                                        **Defendants.**
———————————————————————————

**APPEARANCES:**                          **OF COUNSEL:**

**REHFUSS, LIGUORI & ASSOCIATES**         **JOHN W. LIGUORI, ESQ.**
40 British American Blvd.
Latham, New York 12110
Attorneys for Plaintiffs

**ROEMER, WALLENS, GOLD &**               **MATTHEW J. KELLY, ESQ.**
**MINEAUX, LLP**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiffs commenced this action against Defendants Tee Bar Corp. and Rocking Horse

Ranch Corp. seeking monetary damages for pain and suffering and loss of consortium as a result

of an accident that occurred on February 6, 2009. Plaintiffs allege that Defendants' negligence

resulted in injury to Plaintiff Donna Rich.

Presently before the Court are the parties motions *in limine*. *See* Dkt. Nos. 46, 59.

Rocking Horse Ranch is a family-owned resort in Highland, New York that provides a variety of activities for guests, including horseback riding, water activities, entertainment, skiing and snow tubing. Plaintiffs Donna and Mark Rich went to the Rocking Horse Ranch with their two children. Plaintiffs checked in on February 6, 2010, and stayed until Sunday, February 8, 2010.

The ski area and tube run at the Ranch are inspected by the New York State Department of Labor. The Ranch receives a permit from the State to operate the lift at the snow tube hill. The snow tube hill has been in continuous operation at the Ranch since 1994 or 1995. On a given day, approximately 1000 tubes will go down the snow tube hill. The snow tubing hill at the Ranch consists of a single tow rope and either one or two lanes for snow tubers. Guests hook their tubes to the tow rope and ride up the hill. Guests then ride their tubes to the bottom. Ranch employees assist with each step, including giving a "gentle" nudge in order to get the guests started down the hill. Guests may ride in single tubes alone or in double tubes with another person. The snow tube hill ends in a flat area covered with hay and then continues into a deceleration ramp – an uphill section designed to further slow riders. "Willy bags" and hay bales are set up to "create a horseshoe for protection" around the deceleration ramp.[2]

Generally, because the speed of the tubes is affected by changeable conditions, the snow tube run is tested by the employees before it opens. If tubers are traveling too far up the deceleration ramp, staff members will add additional deceleration mats – rubber mats used to

---

[1] The facts in this case, unless otherwise noted, are undisputed.

[2] The parties disagree on whether "Willy bags" were in place on the evening of Plaintiff's accident.

slow the riders – and they will add additional hay at the base of the deceleration ramp, stretching it out so that tubers hit the hay sooner and slow down. Ranch employees test both the single and double tubes before opening the snow tube hill to guests.[3] Typically, the double tubes will go farther than the single tubes. Generally, because the conditions are changeable, Ranch employees constantly monitor the distance guests are traveling, and they make adjustments to the hay and mats as needed, even after the hill has opened to guests.[4]

On the evening of February 6, 2010, Plaintiff Donna Rich and her family went snow tubing at the Ranch. The highest temperature was 26 degrees Fahrenheit with a low temperature of zero degrees Fahrenheit.[5] Plaintiff Donna Rich knew that snow tubing involved risks, including the fact that there are no brakes on the tube and no way to steer the tube. Plaintiff took approximately three or four trips down the hill with her daughter on a double tube. Each time they would ride to the top of the hill using the tow rope. An attendant at the top of the tow rope would unhook their tube after they climbed off of it, and they would wait in line for their turn to go down the hill. Each time Plaintiff Donna Rich rode down the hill with her daughter, she came to a complete stop on the hay at the bottom of the hill. After taking three or four trips down the hill with her daughter, Plaintiff switched to a single tube. Plaintiff rode to the top of the hill in her single tube and found the same two attendants working at the top of the hill – Tim McDerrmott and Sal Frisher. Plaintiff claims that the two attendants were talking to each other

---

[3] The parties dispute whether these procedures were in place on the evening of Plaintiff's accident.

[4] The parties dispute whether these procedures were in place on the evening of Plaintiff's accident.

[5] *See* Affidavit of Paul F. Cooney, annexed to Defendants' motion for summary judgment as Exhibit P. The affidavit contains certified meteorological records from the National Climatic Data Center.

about trying to get tubers to strike the back of the wall at the end of the tube run. Plaintiff claims that McDermott pushed a girl in a tube, and she went down the hill "at a good pace" and then stopped on the hay.

McDermott helped Plaintiff's daughter into a tube and pushed her down the hill. Plaintiff then got into her tube. Plaintiff claims that, without warning, Frisher took the rope attached to her tube, ran her back towards the woods, then turned and ran her to the top of the hill and "flung" her down the hill. McDermott does not remember the incident at all and denies ever seeing a coworker "fling" a tuber down the hill. Frisher does not remember the incident and denies ever seeing anyone "fling" a tuber down the hill. Plaintiff struck the barrier at the top of the deceleration ramp. Amanda Odendahl ("Odendahl"), a Ranch employee, was working at the snow tube hill on the evening of Plaintiff's accident and testified that she, "remember[ed] a woman coming down and hitting the back of the wall, rolling out of her tube". At the time of Plaintiff's accident, the temperature was between 15 and 20 degrees Fahrenheit.

Ranch employees assisted Plaintiff from the hill. Jack Barnello ("Barnello"), a first aid provider and the manager on duty, examined Plaintiff. Barnello walked Plaintiff to the ski shop area so that she could sit down. They stayed in the ski shop area for approximately ten minutes, but Plaintiff wanted to go back to her room to lie down. Plaintiff returned to her room and Barnello brought another employee, a nurse, to check on Plaintiff in her room. Plaintiff complained of a headache. Barnello and the nurse suggested that Plaintiff get checked at the hospital, but Plaintiff refused to go. Barnello completed an accident report regarding the incident. Plaintiff claims that she told Barnello that she was "flung" down the hill. Barnello denies the conversation. The accident report indicates that the accident occurred at 8:00 p.m. at the "bottom of tube run". In the section of the report entitled "Description of Incident, Statements,

Witness(es), Address of Witness(es), Barnello wrote: "Guest struck her head (left side) on the back wall of the tube run. She was in a single tube, she was thrown into the back wall when tube hit the back wall."

Plaintiff did not receive any medical treatment that evening. The next day, Plaintiff skied for an hour or two with her family. While at the ski hill, Plaintiff Donna Rich spoke with Anthony Riggio ("Riggio), the head of grounds at the Ranch, and claims that she told Riggio about the accident. Riggio denied that Plaintiff told him that she had been "flung" down the hill. In the days after the accident, Plaintiff claims that she spoke with Stanley Ackerman, the Ranch's general manager. However, the parties do not agree on the substance of that conversation. Plaintiff Mark Rich testified that Plaintiff Donna Rich told him that she was "flung" down the hill. Plaintiff Mark Rich did not see the accident occur and did not discuss the accident with any Ranch employees. Plaintiff Donna Rich took Advil and remained at the Ranch for the weekend.

Currently before the Court are the parties' motions *in limine* asking the Court to exclude certain evidence and testimony. *See* Dkt. Nos. 46, 59.

### III. DISCUSSION

**A. Standard**

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). A court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94-cv-5220, 1998 WL 665138, *3 (S.D.N.Y. Sept. 25, 1998). Courts considering a motion *in limine* may reserve decision until

trial so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996). Alternatively, the court is "free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling" at trial as "the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer." *Luce*, 469 U.S. at 41-42.

**B.      Plaintiffs' motion *in limine***

In their motion *in limine*, Plaintiffs seek the following relief: (1) an order precluding Defendants from introducing a video depicting a reenactment/test runs; (2) an order precluding the opinions of Defendants' proposed liability expert; and (3) an order precluding the testimony of Defendants' lay witnesses (Steven Turk, Jack Barnello and Raphael Suarez) regarding the February 11, 2012 "reenactment." *See* Dkt. No. 46.

### *1. The reenactment video*

Defendants submitted a video of test runs taken at the Rocking Horse Ranch on February 11, 2012, which their expert, Jim Engel, relies upon in assessing whether it is possible for the manner in which a rider is launched to cause the rider to travel farther down the tube run. The video depicts nine (9) test runs: three (3) began without the rider being pushed at all, three (3) began with a "strong push," and three (3) began with a flinging motion. Plaintiffs argue that the video should be excluded because it is not substantially similar to the alleged actual event and because its probative value is substantially outweighed by its prejudicial effect. *See* Dkt. No. 46 at 2-4.

"A party wishing to introduce an experiment for litigation must show 'a substantial similarity' between the experiment and the actual conditions of the claim." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (quotation omitted). "However, perfect identity between experimental and actual conditions is neither attainable nor required." *Guild v. General Motors Corp.*, 53 F. Supp. 2d 363, 366 (W.D.N.Y. 1999) (citation omitted).

Plaintiffs challenge the validity of Defendants' experiment on the hill by claiming that the experiment conditions did not exactly mirror the conditions on the day of Plaintiff Donna Rich's accident, thereby rendering the results unreliable for purposes of trial. The Court disagrees. The purpose of the experiment was not to exactly reconstruct the conditions on the day of the accident, but to demonstrate the effect that pushing and flinging would have on the distance traveled by a tuber. The experiment occurred over the course of an hour, with each run down the hill occurring under similar conditions as the run before it.

Plaintiffs also argue that the temperature was between 15 and 21 degrees at the time of the accident, and it was 28 degrees at the time of the test run, thereby making the experiment too dissimilar. *See* Dkt. No. 46 at 3-4. The Court finds this argument unpersuasive. The experiment, while not exactly replicating the accident, was substantially similar to the actual conditions. The dissimilarities Plaintiffs have identified "affect the weight of the evidence, not its admissibility." *Veliz v. Crown Lift Trucks*, 714 F. Supp. 2d 49, 51 (E.D.N.Y. 1989) (quotation omitted). Finally, any prejudice or confusion created by the differences Plaintiffs have identified can be eliminated by an instruction to the jury explaining the limited purpose of the experiment.

Based on the foregoing, the Court denies Plaintiffs' motion insofar as it seeks to preclude Defendants from introducing this video.

### *2. Testimony of Defendants' liability expert*

Plaintiffs seek an order precluding Defendants' proposed liability expert, Jim Engel, from testifying "because he is unqualified, his findings are unreliable and prejudicial." *See* Dkt. No. 46 at 5.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)). The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit

> it to be considered. In this inquiry, the district court should
> consider the indicia of reliability identified in Rule 702, namely, (1)
> that the testimony is grounded on sufficient facts or data; (2) that
> the testimony is the product of reliable principles and methods; and
> (3) that the witness has applied the principles and methods reliably
> to the facts of the case. In short, the district court must make
> certain that an expert, whether basing testimony upon professional
> studies or personal experience, employs in the courtroom the same
> level of intellectual rigor that characterizes the practice of an expert
> in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted). The court

must also consider the fact that "experience in conjunction with other knowledge, skill, training or

education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields,

experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526

U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations

based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and

methodology employed by the expert, without regard to the conclusions the expert has reached or

the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266

(citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district

court should undertake a rigorous examination of the facts on which the expert relies, the method

by which the expert draws an opinion from those facts, and how the expert applies the facts and

methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification

of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.*

"'The judge should only exclude the evidence if the flaw is large enough that the expert lacks

good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; accord *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In the present matter, Defendants plan to call James A. Engel as an expert witness. Mr. Engel has been working in the ski industry since 1968. *See* Dkt. No. 46-1 at 4-6. He has been an owner, operator, and manager at different ski mountains and has served on the Board of Directors of the Wisconsin Ski Industries Association for nearly thirty (30) years. *See id.* In 1997, Mr. Engel developed "a multi-faceted snow tubing operation " consisting of twenty (20) acres, twenty

tubing chutes "with a variety of topographic slope changes, a 540 foot long Magic Carpet conveyor lift and one 500 foot long handle tow for tubes." *See id.* at 5.  Mr. Engel continues to operate that snow tubing operation to this day.  *See id.*

Mr. Engel has a degree in education, with a minor in science.  *See id.* at 4.  He has presented at seminars regarding snow tubing operations, where he discusses design, operation, and risk management of these types of facilities.  *See id.* at 4-6.  Further, he has presented expert testimony regarding ski area litigation at depositions and trials in Wisconsin and Illinois.  *See id.* at 5-6.

Defendants assert that Mr. Engel's expertise "is based on his many years of experience, and his testimony is, in part, related to the results of a videotaped experiment conducted at Defendants' facility."  *See* Dkt. No. 68 at 8.  Defendants argue that the "science of snow tubing is not an academic discipline like engineering or medicine, and it cannot be held to the same scientific principles as those disciplines."  *See id.*  Further, Defendants claim that, contrary to Plaintiffs argument, Mr. Engel will not be telling the jury what conclusion to reach.  *See id.* at 9.  Rather, he "will simply be discussing snow tubing operations and the videotaped experiment. The fact that the experiment is videotaped is beneficial to both Plaintiff and Defendants; it will allow the jury to view the experiment independently, consider it in relation to Mr. Engel's testimony, and then decide whether to credit or reject that testimony."  *See id.*

The Court agrees with Defendants.  Mr. Engel's proposed testimony is based on his extensive experience, technical expertise, and the videotaped experiment conducted at Rocking Horse Ranch.  The experiment does not rely on advanced scientific principles or elaborate calculations.  It is designed to show what effect pushing and "flinging" a snow tube has on the distance the snow tube travels.  Mr. Engel's proposed testimony does not instruct the jury what

conclusion to reach, but rather will aid the jury in understanding the issues at trial. *See Foster v. Trollhaugen, Inc.*, Civil No. 06-2983, 2008 WL 5431178, *8 (D. Minn. Sept. 12, 2008) (holding that "it is difficult for an expert to gain firsthand experience in the design, construction, or maintenance of snow tub runs without working for the snow tubing industry").

Based on the foregoing, the Court denies Plaintiffs' motion insofar as it seeks to preclude Defendants from calling Mr. Engel as an expert witness. Mr. Engel is sufficiently qualified and the methods he has used to reach his conclusions are sufficiently reliable.

### 3. Testimony from Defendants' lay witnesses regarding the experiment

Plaintiffs object to the testimony of Defendants' witnesses Steven Turk, Jack Barnello, and Raphael Suarez regarding their involvement with the experiment at the Rocking Horse Ranch snow tubing him. Plaintiffs argue that, "[f]or the reasons set forth at length above regarding the lack of reliability in the results allegedly obtained from the February 11, 2012 'reenactment,' together with the prejudicial effect that such a dissimilar reenactment would have upon a jury, the aforestated lay witness[es] must be precluded from testimony with regard to the results and/or their participation in the February 11, 2012 'reenactment,' as well as any other reenactments conducted on their own accord."

The Court finds that it is premature at this time to make a ruling on these objections. "The Court is unwilling to speculate, pretrial, as to what statements any witness will or will not make during trial." *Picciano v. McLoughlin*, No. 5:07-cv-781, 2010 WL 4366999, *5 (N.D.N.Y. Oct. 28, 2010). Throughout the course of the trial, Plaintiffs may object to testimony that they believe is inadmissible and the Court will issue a ruling at that time.

Based on the foregoing, the Court denies this portion of Plaintiffs' motion *in limine* as premature.

## C.    Defendants' motion *in limine*

In their motion *in limine*, Defendants seek the following relief: (1) an order precluding Plaintiffs' expert, Paul Cooney, from testifying; (2) an order precluding Plaintiffs from introducing evidence of a refund; (3) an order permitting Timothy McDermott to testify about his habits while working for Defendants; and (4) an order precluding Plaintiffs from introducing negative comments made to Plaintiff Donna Rich by Defendants' employees. *See* Dkt. No. 59.

### *1. Testimony of Plaintiffs' liability expert*

Defendants argue that Mr. Cooney, an engineer, does not have the requisite expertise to give an opinion in this matter. *See id.* at 5 (citations omitted).  Second, Defendants assert that, "even if Cooney is found competent to render an opinion on this matter, he failed to do so in a way that would render his opinion reliable." *See id.* "For example, Cooney used assumed figures for the coefficient of friction for snow, the coefficient of friction for hay, the coefficient of friction for an uphill deceleration ramp, the arm length of the person who did the 'flinging' at the top of the hill, the distance from the tether to the center of gravity on the tube, the initial velocity of the tube going down the hill, the weight of the tube, the time it took to make the revolution of the fling, and that the coefficient of fraction remained constant down the hill." *See id.* at 5-6 (citation omitted).

The Court finds Defendants arguments to be without merit.  In *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997), the accident involved a baggage claim system at an airport and

the Second Circuit held that the district court should have allowed the plaintiff's expert, who was an expert in how, generally, machines interacts with persons, but had no specific experience with baggage claim systems. *See id.* at 81. The court explained that "[i]t is hard to imagine an expert in airport terminal design or baggage claim systems who developed that expertise in any way other than by working for the airline industry. Accordingly, to require the degree of specificity the court imposed came close to letting that industry indirectly set its own standards. At times this cannot be avoided. But where, as here, well-trained people with somewhat more general qualifications are available, it is error to exclude them." *Id.* at 82.

In the present matter, Mr. Cooney extensive experience with modes of transportation, including the design and construction details of bridges and roadways and their surfacing, as well as coefficients of friction of such surfaces. He also has experience testing on various levels of snow and ice. As such, the Court finds that he has the requisite knowledge, skill, experience and training to assist the trier of fact in resolving the issue at hand. *See Wick v. Wabash Holding Corp.*, 801 F. Supp. 2d 93, 109 (W.D.N.Y. 2010).

Further, the Court finds unpersuasive Defendants' arguments regarding the reliability of Mr. Cooney's methods and principles. According to Plaintiffs, "Mr. Cooney's figures were derived from his best estimations given the video submitted by Defendants and the affidavit of Mr. Engel. For example, Mr. Cooeny derived certain variables by using a stopwatch while viewing the video to estimate time or to verify the accuracy of his estimations, including the coefficients of friction. Inherently, if Mr. Cooney's figures are unreliable, the video must also be deemed unreliable for failure to show, for example, measurements of the length of the rope on the tube, the weight of the rider, the distance traveled by the tubes and various other variables." *See* Dkt. No. 69 at 2. As Plaintiffs correctly argue, Defendants' assertions are not bases for exclusion,

14

but, rather, are issues of the weight to be given to Mr. Cooney's opinions by the trier of fact. *See Varga v. Rent-A-Center*, No. 3:10–cv–559, 2012 WL 2178866, *6 (N.D.N.Y. June 13, 2012) (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, . . . and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable" (quotation omitted)).

Based on the foregoing, the Court denies Defendants' motion *in limine* as to this claim.

### 2. Evidence regarding refunds – Fed. R. Evid. 408

Defendants argue that Plaintiffs should be precluded from introducing evidence that the Rocking Horse Ranch issued refunds to customers injured at the premises, including to Plaintiff Donna Rich. *See* Dkt. No. 59 at 7.

Rule 408 generally prohibits the introduction of evidence regarding offers of compromise or settlement when the evidence is offered "to provide liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Fed. R. Evid. 408(a). Evidence of an offer to compromise may be admissible under the Rule, however, if it is offered for another purpose. *See* Fed. R. Evid. 408(b). "In applying the 'another purpose' exception to Rule 408, 'the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations.'" *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999) (quotation omitted).

Although the Court agrees with Plaintiffs that this evidence does not fit within Rule 408 because it was not made within the context of an explicit settlement offer of compromise or within the context of negotiations, the Court nevertheless finds that the statements are

inadmissible.  First, the Court fails to see how evidence that Defendants offer refunds to persons injured on their property is in any way relevant to the issues in the present matter.  Second, the Court finds that the limited probative value of this evidence is substantially outweighed by its prejudicial effect.

As such, the Court grants Defendants' motion *in limine* as to this claim.

### 3. Testimony regarding habit and procedure at the snow tube hill

Defendants argue that Timothy McDermott and Sal Frisher, former employees, should be permitted to testify to the manner in which they pushed tubes down the hill while working at the snow tubing hill.  *See* Dkt. No. 59 at 9.  Defendants assert that this testimony is necessary because Plaintiffs' attorney attempted to impeach Mr. McDermott's testimony by contending that he did not have a precise recollection of what he did on the night of the accident.  *See id.*

Under Rule 406 of the Federal Rules of Evidence, evidence of habit or routine "may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."  Fed. R. Evid. 406.  The Second Circuit has defined "habit" as "'semi-automatic' — it involves a 'person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time.'"  *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (quotation omitted).

In the present matter, the Court finds that it does not have sufficient information regarding the proposed testimony to rule on this aspect of Defendants' motion at this time.  As such, the Court reserves judgment as to this part of Defendants' motion.

#### *4. Testimony about statements regarding employees Frisher and McDermott*

Plaintiffs assert that "it is expected that Plaintiff [Donna Rich] will testify that she had conversations with employees Barnello, Ackerman and Riggio regarding the conduct of Timothy McDermott and Salvatore Frisher on the night of the Plaintiff's accident."  *See* Dkt. No. 69 at 6. Plaintiffs claim that statements were made admitting improper conduct on the part of the attendants at the tubing hill.  *See id.*  The statements further indicated that the tubing attendants had been disciplined as a result of the incident.  *See id.*  Plaintiff asserts that they are admissible pursuant to Rule 801(d)(2) of the Federal Rules of Evidence.  *See id.*  Defendants oppose the introduction of these statements.  *See* Dkt. No. 59 at 10-11.  Defendants claim that "Plaintiff's contentions are not admissible because they are vague, do not clarify the issues, and are not made by persons with authority on the matter.  Moreover, all three witnesses deny ever making the statements."  *See id.* at 10.

"Rule 801(d)(2)(D) of the Federal Rules of Evidence defines as nonhearsay a statement offered against a party that is 'a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.'" *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 128 (2d Cir. 2005) (quoting Fed. R. Evid. 801(d)(2)(D)).  "In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient foundation by establishing '(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.'"  *Id.* at 128-29 (quoting *Pappas*, 963 F.2d at 537).

The Second Circuit has held that admissibility under this rule should be granted freely. "Liberal admissibility of this sort of proof is grounded on certain premises.  One is that an

employee is usually the person best informed about certain acts committed in the course of his employment[.]"  *Pappas v. Middle Earth Condominium Association*, 963 F.2d 534, 537 (2d Cir. 1992).  In *Pappas*, the Second Circuit demonstrated this liberal standard by admitting testimony of an unidentified employee, explaining that "circumstantial evidence" proved that there was an agency relationship between the witness and the employer.  "[C]ircumstantial evidence may establish the scope, as well as the existence, of the agency relationship."  *Id.* at 538.

As the Second Circuit has made clear, Plaintiffs are required to lay foundation establishing the agency relationship, that the statements were made during this relationship, and that the statements relate to a matter within the scope of the agency.  In light of the foundation required to introduce these statements under Rule 801(d)(2), the Court will reserve its ruling on this issue to determine whether Plaintiffs lay the appropriate foundation.  *See Leser v. U.S. Bank Nat. Ass'n*, No. 09-CV-2362, 2012 WL 6738402, *5 (E.D.N.Y. Dec. 29, 2012).

**D.**      **Plaintiffs' supplemental motion *in limine***

In a letter motion filed on September 23, 2013, Plaintiffs ask the Court to preclude Defendants from attempting to impeach Plaintiff Donna Rich concerning her treatment for depression and anxiety prior to the February 6, 2009 accident.  *See* Dkt. No. 71 at 1.  Plaintiffs assert that they are withdrawing any claim for depression or emotional injury related to the accident and do not expect to present any proof regarding any emotional or mental accident.  *See id.*  "Moreover while the plaintiff will be making a claim for loss of enjoyment of life as a result of her physical injuries, she will not be presenting any evidence or making a claim of emotional harm or having suffered depression as a result of the incident in question."  *See id.*

Defendants oppose Plaintiffs' supplemental motion and argue that the motion should be denied as both untimely and without legal support. *See* Dkt. No. 73. Defendants argue that "[i]t would be fundamentally unfair to allow Plaintiff to exclude evidence just before trial begins when she has long-ago waived her confidentiality rights on the issue." *See id.* (citing *Bruno v. CSX Transp., Inc.*, 262 F.R.D. 131, 134 (N.D.N.Y. 2009)). Further, Defendants claim that her mental health treatment, including her use of anti-depressant medications, are specifically relevant to "Plaintiff's ability to accurately perceive events and to truthfully retell them[.]" *See id.* at 2.

"It is well settled that a party waives [her] doctor-patient privilege when [she] puts [her] medical condition into issue." *Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 220 (S.D.N.Y. 2001); *see also In re Sims*, 534 F.3d 117, 132, 134 (2d Cir. 2008). However, in *In re Sims*, the Second Circuit instructed "that a plaintiff does not forfeit [her] psychotherapist-patient privilege merely by asserting a claim for injuries that do not include emotional damage" and "a plaintiff does not forfeit that privilege by merely stating that [s]he suffers from a condition such as depression or anxiety for which [s]he does not seek damages." *In re Sims*, 534 F.3d 117, 134 (2d Cir. 2008). The court held that "a plaintiff may withdraw or formally abandon all claims for emotional distress in order to avoid forfeiting [her] psychotherapist-patient privilege." *Id.* Thus, a plaintiff may continue to protect the privacy of her mental health records, but only at the expense of her mental health claims that go beyond garden variety emotional distress. *See id.* at 142 (finding that the plaintiff withdrew "any claim to damages for mental injury or any non-garden-variety emotional injury," and was not required to disclose his mental health records).

In light of this authority and Plaintiffs' assertion that they are withdrawing their claim for emotional harm or having suffered depression as a result of the incident in question, the Court finds that Plaintiff Donna Rich has avoided forfeiting her privilege. *See id.*

To the extent that Defendants seek to impeach Plaintiff Donna Rich regarding her treatment for depression and anxiety prior to February 6, 2009, the Court finds that this line of questioning is relevant and permissible for impeachment purposes. Plaintiff Donna Rich's credibility is directly at issue in this case. Her ability or inability to accurately recall the events of February 6, 2009 are central to the cases of both sides. Plaintiff Donna Rich's ability to accurately perceive events and to truthfully retell them is a subject that is material and relevant for cross-examination.[6]

Based on the foregoing, the Court grants in part and denies in part Plaintiffs' supplemental motion *in limine*.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion *in limine* (Dkt. No. 46) is **DENIED** as set forth herein; and the Court further

**ORDERS** that Defendants' motion *in limine* (Dkt. No. 59) is **GRANTED in part** and **DENIED in part** as set forth herein; and the Court further

---

[6] Although the Court will permit Defendants to pursue this line of inquiry during cross-examination of Plaintiff Donna Rich, the Court may limit the amount of time permitted and focus of this inquiry at trial.

**ORDERS** that Plaintiffs' supplemental motion *in limine* (Dkt. No. 71) is **GRANTED in part** and **DENIED in part** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve of copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 27, 2013
      Albany, New York

Mae A. D'Agostino
U.S. District Judge